| | |
|---|---|
| FRIENDS OF THE CLEARWATER, | Case No.3:16-cv-00485-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CHERYL F. PROBERT, in her official capacity as Nez Perce-Clearwater Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | **(Docket No. 26)** |
| Defendants, | |
| and | |
| IDAHO ASSOCIATION OF COUNTIES, an Idaho Non-Profit Corporation; and IDAHO GOVERNOR C.L. "BUTCH" OTTER; | |
| Defendants-Intervenors. | |

Now pending before the Court is Plaintiff's Motion for Preliminary Injunction (Docket

No. 26). Having carefully considered the record, participated in oral argument, and otherwise

being fully advised, the undersigned enters the following Memorandum Decision and Order:[1]

## SUMMARY OF DECISION

The purpose of the Orogrande Protection Project is to enhance public safety and to

protect private homes and structures from wildfire in the Orogrande community, located in a

---

[1] Plaintiff's Motion for Preliminary Injunction followed Defendants' April 20, 2017 Notice, in which Defendants indicated that "the contractor for the Orogrande Protection Project may commence activities on the subject lands commencing on June 1, 2017, or on any date thereafter." 4/20/17 Notice (Docket No. 25). Following expedited briefing, oral argument took place on May 18, 2017.

**MEMORANDUM DECISION AND ORDER - 1**

remote region of Idaho County.  In this lawsuit, the Plaintiff Friends of the Clearwater seeks to

enjoin those activities of the Orogrande Project intended to occur within the West Fork Crooked

River Inventoried Roadless Area ("IRA").  The issue became time-sensitive when the Forest

Service gave notice that project-related activities might begin as early as June 1, 2017, upon

which the  Friends of the Clearwater  moved for a preliminary injunction seeking to stop such

work upon any portion of the IRA because such activities allegedly "will cause irreparable harm

to potential wilderness values by developing the area with an irregular shelterwood cut and a

road."

     After consideration of the respective arguments of the parties, the Court will not issue the

requested preliminary injunction.  While the nature of the Orogrande Project's fuel-reduction

activities will impact the existing natural landscape of a small portion of the West Fork Crooked

River IRA, those particular activities are critical to the Orogrande community and to the safety

of persons living adjacent to and using the national forest in that region.  Further, the Court is not

persuaded on this record that Plaintiff has a likelihood of success on the merits of their claims, a

showing which is required (along with other factors further described in this Decision), before an

injunction can issue.  Here, there is evidence that the Forest Service's decision to approve the

Project complied with applicable environmental laws and regulations.  Therefore, on the current

record, measured against the applicable legal standards, the Court will not issue a preliminary

injunction.  Although this decision does reflect that the Court is not persuaded on the present

record that the Plaintiff has a likelihood of success on the merits, this is not a final decision on

the merits of the case.

**MEMORANDUM DECISION AND ORDER - 2**

# BACKGROUND

## A.     The Orogrande Project

The Orogrande Community Protection Project ("Orogrande Project") sits in Idaho County, Idaho, in the Crooked River Watershed of the Red River Ranger District of the Nez Perce-Clearwater National Forest.  *See* (AR 14224).  The 45,278-acre project area is contained within rural wildland interface areas mapped by the 2009 Idaho County Community Wildfire Protection Plan ("CWPP").  *See id*.  The CWPP identifies both the urban and rural interface areas, with the vast majority of the Orogrande Project falling with the rural interface.  *See id*.

In 2001, Orogrande was formally identified as a community at risk for wildfire – a "wildland interface community within the vicinity of federal lands that are at high risk from wildfire." *See id*.  Such a designation represents a conclusion that conditions in much of Orogrande's surrounding forest (high forest density and fuel loading) present an increased risk of high-intensity, stand-replacing wildfire.  *See id*.  The Orogrande Project is designed to address the needs set forth in the CWPP and reduce fuel continuity near the Orogrande community, near other private lands, and along Forest Road 233 (the "Crooked River Road").  *See id* at (AR 14224-25).  The Project is also intended to reduce the risk of high intensity wildfires and to improve forest health, vigor, and resilience within forest stands.  *See id*.

The Project was considered in the ordinary NEPA course, leading to a "Decision Notice and Finding of No Significant Impact" formally approving the Orogrande Project on January 29, 2016, issued by the Forest Supervisor, Cheryl Probert.  *See* (AR 14250).  The selected alternative (Alternative 2) authorized five different treatments across 3,415 acres to reduce fuels and modify stand conditions to improve forest health, including: (1) thinning from below, followed by prescribed fire to reduce ladder fuels and increase spacing between canopy crowns to 10-20 feet

**MEMORANDUM DECISION AND ORDER - 3**

on 154 acres (Treatment A); (2) thinning from below, followed by prescribed fire in riparian habitat conservation areas to remove ladder fuels on 432 acres (Treatment B); (3) irregular shelterwood cut, followed by prescribed fire to treat ladder fuels and reduce canopy density in mixed-conifer units on 280 acres (Treatment C); (4) precommercial thinning on 75 acres to reduce the density of sapling-pole-sized lodgepole pine stands and promote vegetative diversity while maintaining stand growth and yield (Treatment E); and (5) prescribed fire on 2,474 acres of inaccessible unites where mechanized treatment is infeasible and fuel loads are sufficient to carry fire, but still light enough so burns can be kept within prescription (Treatment F). *See* (AR 14224, 14226-28).[2]

Of significance in this case, portions of two inventoried roadless areas ("IRA") are located within the Orogrande Project boundary: the West Fork Crooked River IRA and the Dixie Summit-Nut Hill IRA. *See* (AR 14143). Work called for by Orogrande Project includes activities within the West Fork Crooked River IRA, but not the Dixie Summit-Nut Hill IRA. *See id*. Specifically, the Orogrande Project calls for construction of 4.5 miles of temporary road, including 2.4 miles in the West Fork Crooked River IRA. Of that total mileage, approximately .5 miles of proposed temporary road will be located or reconstructed on existing or decommissioned roads (cleared disturbed areas). *See* (AR 14228).

**B.      The Idaho Roadless Rule[3] and the West Fork Crooked River IRA**

In the 1970s, the Forest Service began to develop an inventory of roadless areas within National Forests. The Forest Service designated roadless areas of more than 5,000 acres as

---

[2] Treatment D – clearcutting with reserves, followed by prescribed fire – no longer applied, following modification. *See* (AR 14228).

[3] The historical backdrop to the formation of the Idaho Roadless Rule is derived from *Jayne v. Rey*, 780 F. Supp. 2d 1099, 1102-04 (2011), and is largely recounted here verbatim, with only select quotation marks and citations.

inventoried roadless areas – IRAs.  As of 2011, there were over 58.5 million acres contained in IRAs throughout the National Forest system.

In 2001, concerned about encroaching development, the Forest Service promulgated the Roadless Area Conservation Rule to "prohibit road construction, reconstruction, and timber harvest in [IRAs] because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." (The "2001 Roadless Rule.")  66 Fed. Reg. 3244 (Jan. 12, 2001).

The 2001 Roadless Rule was nation-wide in scope and did not contain variations tailored for each State.  As a result, some states and communities felt disenfranchised by the process.  In 2005, the Forest Service opted for a new approach, inviting States to submit petitions to adjust the management requirements for the IRAs within their borders.  In conjunction with this new approach, the Department of Agriculture ("USDA") created the Roadless Area Conservation National Advisory Committee ("RACNAC"), an advisory committee composed of 14 members to review State petitions and provide advice to the Department.  The RACNAC included representatives from state and local governments, industry trade associations like the National Cattleman's Beef Association and National Mining Association, and conservation-oriented groups, including Trout Unlimited, Montana Wilderness Association, Nature Conservancy, and the Center for Biological Diversity.

In 2005, Idaho's Governor began a collaborative process to draft a state petition governing the 9.3 million acres of IRAs within Idaho.  The Idaho petition was submitted to the RACNAC in 2006 and then-Governor James Risch and his staff met with RACNAC in Washington D.C. to discuss the petition and clarify the intent.

**MEMORANDUM DECISION AND ORDER - 5**

The RACNAC then held four meetings to take comments on Idaho's petition. Many

industry and conservation-oriented groups that were not directly represented on the RACNAC

itself participated in these meetings. In addition to the RACNAC meetings, the USDA held 16

public meetings in Idaho, and obtained additional input in the written comment period. In this

process, Idaho's petition was modified and refined and ultimately, the RACNAC – in a

unanimous vote – recommended to the USDA that the petition be approved. The USDA did so

on December 22, 2006.

The result – known as the Idaho Roadless Rule – creates different categories of lands

within Idaho's 9.3 million IRA acres based on the specific attributes of those lands, and then

applies different management "themes" to each category. For example:

- The Wild Land Recreation ("WLR") theme covers about 1.5 million acres. All road construction in the WLR is banned except for roads required by "statute, treaty, reserved or outstanding rights, or other legal duty of the United States." 36 C.F.R. § 294.23(a). Similarly, all timber cutting on WLR lands is banned, except where incidental to some other management activity permitted by the Idaho Roadless Rule (such as constructing a road described above).

- The Primitive theme covers 1.7 million acres. For Primitive areas, road construction is prohibited, subject to a single exception.

- The Special Areas of Historic or Tribal Significance ("SAHTS") theme covers 50,000 acres and are treated similarly to Primitive areas.[4]

- The Backcountry/Restoration ("BCR") theme covers 5.3 million acres. Protections are reduced here because temporary roads and logging *are* allowed to reduce the threat of wildfire. The Idaho Roadless Rule allows

---

[4] For these three categories/themes – WLR, Primitive, and SAHTS – the Idaho Roadless Rule provides more protection than the 2001 Roadless Rule. The other two categories/themes that follow – BCR and GFRG – allow more roads and logging than contemplated by the 2001 Roadless Rule.

**MEMORANDUM DECISION AND ORDER - 6**

temporary road construction and logging within 442,000 acres of community protection zones ("CPZs") within BCR lands. Outside of CPZs, roads and logging are only allowed if there is a significant wildfire risk to a community or water supply, and protection "cannot be accomplished without a temporary road." *See* 36 C.F.R. § 294.23(b)(2) & (3).[5],[6]

• The General Forest Rangeland "GFRG" theme covers about 400,000 acres that are mainly managed according to forest plan direction, except that roads may not be constructed to access new mineral or energy leases other than to access specific areas of phosphate deposits. In contrast, the 2001 Roadless Rule prohibited road construction in connection with new mineral leases issued after January 12, 2001. *See* 36 C.F.R. § 294.12(b)(7).

Before putting the Idaho Roadless Rule in place, the Forest Service consulted with the

Fish and Wildlife Service ("FWS") under Section 7 of the Endangered Species Act ("ESA")

after finding that the new Idaho Roadless Rule is likely to adversely affect eight listed species.

As a result of the consultation, the FWS issued a Biological Opinion finding that the Idaho

Roadless Rule is not likely to jeopardize the continue existence of any listed species. In August

of 2008, after reviewing the Biological Opinion, the Forest Service issued a Final Environmental

---

[5] To reduce the significance of allowing temporary roads and logging in the BCR, the Idaho Roadless Rule imposes three restrictions. First, it requires that "the project generally retains large trees as appropriate for the forest type. 36 C.F.R. § 294.24(c)(1)(I). Second, timber cutting outside the CPZ is similarly limited, along with a requirement that the action maintains or improves roadless characteristics over the long term. *See* 36 C.F.R. § 294.24(c)(2). Third, the building of temporary roads outside of the CPZ to deal with "significant risks" of wildland fire is explicitly anticipated to be "infrequent" (*see* 36 C.F.R. § 294.23(b)(3)), and the Idaho Roadless Rule requires the "temporary roads" built under its terms must be decommissioned upon completion of the project. *See* 36 C.F.R. § 294.23(d).

[6] The State of Idaho and RACNAC were united in their intent that the BCR rules be read to provide at least the same projections as the 2001 Roadless Rule with flexibility to protect communities from the threat of wildfires. The Forest Service agreed to treat the BCR lands in that manner, and provided: "[u]nder the final rule, the vast majority of the BCR acres will be managed comparable to the 2001 Roadless Rule with a small amount of additional timber cutting and temporary road construction to allow fuel treatments to better protect vital community interests." 73 Fed. Reg. 61465 (Oct. 16, 2008).

**MEMORANDUM DECISION AND ORDER - 7**

Impact Statement. On October 16, 2008, the Forest Service issued a Record of Decision

adopting the modified Idaho Roadless Rule.

Relevant here, the West Fork Crooked River roadless expanse was added to the Forest

Service's roadless inventory during the development of the Idaho Roadless Rule. *See* (AR

16102). The expanse totals 11,626 acres and represents the direct, indirect, and cumulative

effects boundary for the at-issue Orogrande Project, and brings in the 9,500-acre West Fork

Crooked River IRA along with 2,126 acres of contiguous unroaded lands. *See* AR (16100).

Importantly, all 9,500 acres of the West Fork Crooked River IRA are in the above-discussed

BCR theme. *See id*.

The West Fork Crooked River roadless expanse is reached by Forest Road 233 from the

north, which also forms the eastern and southern boundaries of the expanse. *See* (AR 14147).

The community of Orogrande is located adjacent thereto, with private property and houses

situated directly next to the West Fork Crooked River IRA. *See* (AR 16099-101). Below is a

map of the Orogrande Project's relation to the West Fork Crooked River IRA, identifying the

Community at Risk/Orogrande (brown areas), Forest Road 233 dividing Orogrande from the

West Fork Crooked River IRA, the CPZ (yellow cross-thatched area), Treatment C's irregular

shelterwood cut (green areas), and the temporary road needed to accomplish Alternative 2's

Treatment C (red hashes/dots) – each overlaid in relation to one another and atop the pertinent

portion of the West Fork Crooked River IRA (black dots):

**MEMORANDUM DECISION AND ORDER - 8**



(AR 14148); *see also* (AR 14254) (visual depiction of Orogrande Project's selected alternative).

**MEMORANDUM DECISION AND ORDER - 9**

**C.**   **Plaintiff's Efforts to Halt the Orogrande Project's Road Building and Timber Harvest on the West Fork Crooked River IRA**

On November 3, 2016, Plaintiff Friends of the Clearwater, filed this lawsuit. *See* Compl. (Docket No. 1). Plaintiff is self-described as a grassroots, Idaho-based, tax-exempt, non-profit organization dedicated to protecting the public wildlands, wildlife, and waters in the Clearwater Basin of North-Central Idaho. Its 800+ members pursue recreation in the West Fork Crooked River IRA, which Plaintiff claims will be adversely impacted by the Orogrande Project. *See generally id*. Specifically, Plaintiff argues that the Forest Service's authorization of road building and timber harvest on approximately 280 acres[7] of the West Fork Crooked River IRA (Treatment C of Alternative 2) unlawfully eliminates roadless characteristics on that portion of the IRA, alleging:

> The part of the Orogrande Project that authorizes activities within the West Fork Crooked River IRA is unlawful under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*., because road building and timber harvest in the IRA will develop (i.e., eliminate roadless characteristics of) a portion of that IRA and because the Forest Service has inadequately disclosed and has inadequately

---

[7] It appears that, of the 280 acres slated for shelterwood cutting via the Orogrande Project, the actual number of those acres *within* the West Fork Crooked River IRA is something less than that. Defendant Intervenors contend that only 180 acres of the West Fork Crooked River IRA are involved with shelterwood thinning, not 280 acres. *See* Intervenors' Opp. to Mot. for P.I., p. 3, n.3 (Docket No. 36) ("Irregular shelterwood cut was authorized on a total of 280 acres, 205 of which were within the [West Fork Crooked River] IRA. However, it should be noted as the [Orogrande] Project moved forward, changes were made that reduced the size of the shelterwood cut to only 180 acres.") (citing (AR 14152, 14226-28, 27197)); *see also* Fed. Defs.' Opp. to Mot. for P.I., p. 12 (Docket No. 35) (168 acres are within "the roadless area boundary"); Pl.'s Mem. in Supp. of Mot. for P.I., p. 5 (Docket No. 26, Att. 1) ("The Forest Service has authorized approximately 205 acres of shelterwood logging in the IRA."). Because of the nature of the larger issues at play in this dispute, the Court's rulings in this Memorandum Decision and Order do not turn upon whether there is a dispute over the actual acreage involved with shelterwood thinning within the West Fork Crooked River IRA, even though the fact that potentially several hundred acres within the IRA will be subject to shelterwood logging and related activities has been fully considered.

**MEMORANDUM DECISION AND ORDER - 10**

discussed or analyzed the impact of such activities. During public comment and objection periods, Plaintiff submitted excerpts of previous Forest Service analyses for other projects on roadless and former roadless areas in the Nez-Perce-Clearwater National Forest. In these project excerpts, the Forest Service determined that road building, timber harvest, or both road building and timber harvest, would adversely impact or already had adversely impacted roadless areas. Despite Plaintiff's comments, and with insufficient explanation, the Forest Service concluded that timber harvest and road building would not significantly impact the West Fork Crooked River IRA, and the Forest Service authorized both logging and road building on approximately 280 acres of this IRA. The Forest Service concluded that the impact would be insignificant even though the agency will reevaluate this IRA for wilderness inventory in the upcoming forest plan when the timber harvest and road building will still be evident and will look unnatural. The Forest Service concluded that the impact would be insignificant even when the Forest Service's own policy directs it to exclude from roadless inventory disturbed areas that have not recovered to resemble surrounding uncut areas. For reasons such as these, developing the West Fork Crooked River IRA with timber harvest and road building has potentially significant impacts, and the Forest Service has not adequately analyzed the environmental impacts as NEPA requires.

*Id*. at pp. 2-3.

Plaintiff seeks to enjoin that portion of the Orogrande Project authorizing the road building and timber harvest on the 280-acre portion of the West Fork Crooked River IRA. *See generally id*. Those efforts became more urgent when, on April 20, 2017, the Forest Service indicated that activities specific to the Orogrande Project – including shelterwood thinning – may begin on June 1, 2017. Plaintiff's Motion for Preliminary Injunction followed.

## DISCUSSION

### A.      Legal Standards

1.      Administrative Procedure Act

"Challenges to final agency actions are reviewed under the deferential standard of the Administrative Procedure Act ("APA")." *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1129 (D. Idaho 2009) (citing *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 875 (9th Cir. 2009)). Under the APA, the reviewing court must set aside the agency's decision if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "deferential and narrow, establishing a high threshold for setting aside agency action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067, 1070 (9th Cir. 2010). A court must not substitute its judgment for that of the agency, but also must not "rubber-stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001). Instead, the court must presume the agency action to be valid and uphold it if a reasonable basis exists for the action. *See Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007). Nevertheless, if the agency "entirely failed to consider an important aspect of the problem," the decision is arbitrary and capricious and must be set aside. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

2.       Preliminary Injunctions

A party seeking the extraordinary remedy of a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

As to a likelihood of success on the merits, different courts have described that factor in various ways, including "reasonable probability," "fair prospect," "substantial case on the merits," and "serious legal questions . . . raised." *See Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012). Such formulations "are largely interchangeable," but require "'at a minimum'" that a petitioner must show that there is a "'substantial case for relief on the merits.'" *Id.* (quoting *Leiva-Perez v. Holder*, 640 F.3d 692, 968 (9th Cir. 2011)). "The standard does not require [a plaintiff] to show that 'it is more likely than not that [it] will win on the merits.'" *Id.* (quoting

**MEMORANDUM DECISION AND ORDER - 12**

*Leiva-Perez*, 640 F.3d at 966); *but see Alliance for Wild Rockies v. Farnsworth*, 2017 WL 1591840, *3 (D. Idaho 2017) ("'[S]erious questions going to the merits' *requires more than showing that 'success is more likely than not' . . . .*") (emphasis added). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).[8]

"While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive relief is not obtained as a matter of right and it is considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Idaho Rivers United v. Probert*, 2016 WL 2757690, *6 (D. Idaho 2016) (citing *Sampson v. Murray*, 415 U.S. 61 (1974); *Brotherhood of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528 (1960); *Stanley v. Univ. of S. California*, 13 F.3d 1313 (9th Cir. 1994)).

**B.     A Preliminary Injunction Is Not Warranted**

Plaintiff argues that it has raised serious questions going to the merits of its NEPA claim "because the Forest Service's conclusion is inconsistent with previous Forest Service analyses and because it failed to take a 'hard look' at its actions." Pl.'s Mem. in Supp. of Mot. for P.I., p. 8 (Docket No. 26, Att. 1).

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA is a procedural statute that "does not mandate particular results but simply

---

[8] Perhaps there is an arguably uncertain interplay between *Cottrell*'s "sliding scale" approach and the *Winter* factors. However, even if it is possible that certain *Winter* factors may apply to overcome less obvious ones under *Cottrell*, a preliminary injunction cannot issue without a threshold showing of a substantial claim to relief.

provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *San Diego Navy Broadway Complex Coal. v. United States Dept. of Def.*, 817 F.3d 653, 659 (9th Cir. 2016).  NEPA exists "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).  "NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed'n of Fishermen's Ass'n v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42 U.S.C. § 4332.  The purpose of NEPA is: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011).  "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council*, 395 F.3d at 1027 (citation omitted).

When reviewing an agency's decision, the court's role is to determine whether the agency took the requisite "hard look" that NEPA demands and provided "a reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action. *Nat. Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Courts review an EA "to determine whether it has adequately considered and elaborated on the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment." *San Diego Navy Brdwy. Complex Coal. v. U.S. Dep't of Defense*, 817 F.3d 653, 659 (9th Cir. 2016).  In doing so, the court considers "whether the EA fosters both informed decision-making and informed public participation." *Id*. (citation omitted).

Here, the undersigned finds that Plaintiff's NEPA-based arguments seeking to enjoin the

Orogrande Project's contemplated shelterwood thinning and temporary road building do not

amount to a substantial case for relief on the merits.

First, while Plaintiff correctly points out that the Forest Service previously considered

logging and road building to impact roadless characteristics (so as to imply that its contrary

conclusion *vis à vis* the Orogrande Project was unlawfully arbitrary and capricious), those other

projects (the Mallard, Cove, and Middle Fork Timber Sales) are sufficiently distinct in nature so

as to remove them from direct relevance to the facts before the Court.  Such projects occurred in

the 1990s, before the Idaho Roadless Rule began its interplay with activities in Idaho's IRAs.

Unlike the issues at play in there, this case involves a discrete and limited exception to the

general rule that logging and road construction are prohibited in IRAs; that is, the West Fork

Crooked River IRA's classification within the BCR theme under the Idaho Roadless Rule

expressly allows the wildfire-abatement activities contemplated within the Orogrande Project in

ways that could not have existed in either of these other projects.  *See* (AR 14234, 14237)

(FONSI: "[T]his decision is consistent with the Idaho Roadless Rule . . ., which states that a

responsible official may authorize temporary road construction and reconstruction for

community protection zone activities, if in the official's judgment, the community protection

objectives cannot be reasonably accomplished without a temporary road. . . . .  The Idaho

Roadless Commission concurred that the [Orogrande] [P]roject meets the 'spirt and intent' of the

Idaho Roadless Rule."); *see also* (AR 14158) (EA: same). In other words, these projects do not

supply the comparison that Plaintiff attempts to draw.

Second, the question of whether a project's effects are significant "requires consideration

of context and intensity."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,

**MEMORANDUM DECISION AND ORDER - 15**

538 F.3d 1172, 1185 (9th Cir. 2008); *see also* 40 C.F.R. § 1508.27. Context refers to the scope of

the agency action. *See id.* Intensity refers to the "severity of impact, which includes both

beneficial and adverse impacts, the degree to which the proposed action affects public health or

safety, the degree to which the effects on the quality of the human environment are likely to be

highly controversial, the degree to which the possible effects on the human environment are

highly uncertain or involve unique or unknown risks, and whether the action [involves]

cumulatively significant impacts." *Id.* at 1185-86. With these considerations in mind, the

context and intensity considered in these other projects was markedly different, when compared

to the instant Orogrande Project. For example:

- The project activities under the selected alternative (Alternative Four) in the Mallard Timber Sale "would directly or indirectly affect about 75 percent of Roadless Area 1847 . . . ," more than 16,000 acres of the roadless area. (AR 14490); *see also* (AR 14491) ("Selection of Alternative Four in this Record of Decision is the critical, irreversible, and irretrievable decision to commit Roadless Area 1847 to roaded development.").

- The project activities under the selected alternative (Alternative Four) in the Cove Timber Sale involved the construction of permanent roads and at least 10 years of planned timber harvest, and was "the critical, irreversible, and irretrievable decision to commit Roadless Area 1921 to roaded development." (AR 14487).

- The project activities under the alternatives considered involved logging between 2,170 and 3,235 acres of roadless area and each alternative "would remove roadless area 1-842 from meeting the minimum size requirements of 5,000 acres." (AR 18661).

However, in comparison, the "vegetation management activities" on the Orogrande Project total

280 acres in the West Fork Crooked River IRA – approximately 2.4% of the roadless expanse

and 3% of that same IRA. *See* (AR 14237) ("The analysis demonstrates that the impacts to the

IRA would be minimal once the temporary road is obliterated and that the roadless

characteristics would not be impacted in the long-term."); *see also e.g.*, *Alliance for Wild*

*Rockies*, 2017 WL 1591840 at \*7 ("In examining the context element, it is important that the logging will take place in a relatively small area. The Tower Project will only log about 13% of the acres burned, while the Grizzly Project will only log about 12% of the acres burned. The logged areas represent just 0.2% of the IPNF."). Thus, the Forest Service reasoned in its EA:

> Forest Service Handbook (FSH) 1909.15, chapter 21.2 describes the class of action normally requiring Environmental Impact Statements include (2) Class 2: Proposals that would substantially alter the undeveloped character of an inventoried roadless area or potential wilderness area (I) constructing roads and harvesting timber in an inventoried roadless area where the proposed road and harvest units impact a substantial part of the inventoried roadless area.
>
> *Since the project has no permanent roads and harvest units total 205 acres or 2.5 percent of the roadless expanse concentrated on the northeastern edge of the inventoried roadless area, this project does not meet the threshold for requiring an Environmental Impact Statement because it does not impact a substantial part of the inventoried roadless area.*

(AR 14158). In short, any parallels between the context and intensity analyses in those other projects and the Orogrande Project are attenuated by the differences between the projects themselves and are not persuasive here, for purposes of the *Winters* test.

Finally, the Court is not persuaded on this preliminary injunction record that the Forest Service failed to take a "hard look" at the impact of logging and road building on potential wilderness designation of the West Fork Crooked River IRA. The Forest Service examined the Orogrande Project's impacts to roadless and wilderness attributes under all of the considered alternatives, and concluded that the selected alternative (Alternative 2):

> would have no direct or indirect effects to the ability to manage the entire roadless area for wilderness because it does not include any permanent roads, the temporary road will be obliterated after use and effects to vegetation will be short-term and concentrated at the northeastern edge of the roadless expanse comprising approximately 2.5 percent of the roadless expanse.

(AR 14154). There is a space for disagreement with that conclusion, which Plaintiff strongly puts forward; but once measured against the complete record, what remains is only a

**MEMORANDUM DECISION AND ORDER - 17**

disagreement with the Forest Service's conclusion, not a basis for setting aside the Forest Service decision. *See Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*, 607 Fed. App'x 670, 671 (9th Cir. 2015) (holding that agency's "assessment of wilderness characteristics" warrants deference); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (holding that courts must be at their "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA"); *Alliance for the Wild Rockies v. Brazell*, 2013 WL 6200199, *19 (D. Idaho 2013) (finding that defendants took the requisite "hard look" at project's impact on roadless characteristics and wilderness, relying on non-binding, but persuasive out-of-state case law: "The fact that the impacts might last for 15-25 years did not affect the court's decision. It noted that there is no case law in support of AWR's position that logging or temporary road construction is prohibited in roadless areas or areas that might some day be designated wilderness. . . . . The plaintiffs have not shown that the Service 'offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise.'") (quoting *Rockies v. Krueger*, 2013 WL 3187275, *17 (D. Mont. 2013)). Thus, according to the Forest Service, despite the Orogrande Project's shelterwood thinning and road building on a discrete portion of the West Fork Crooked River IRA, the area's continued status as an IRA, as well as its consideration for future wilderness designation, will not be impacted as a result.[9]

---

[9] This is a legitimate concern, addressed at length during oral argument. Counsel for the Forest Service was specifically queried on the subject, and counsel said the Forest Service would not use the fact of the Orogrande Project *per se* as justification for adjusting impacted wilderness or IRA boundaries. Such representations might be a basis to argue that the Forest Service is precluded from taking contrary positions in the future, but the Court does not decide such a

At this stage of the case, these realities combine to leave Plaintiff's motion for preliminary injunction short of a substantial case for relief on the merits – the first factor under *Winter*. Because it is a threshold inquiry, when "a plaintiff has failed to show the likelihood of success on the merits, [the court] 'need not consider the remaining three [*Winter* elements].'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776-77 (9th Cir. 2011)).[10] Accordingly, there is no basis to issue a preliminary injunction.

///

///

---

question here. It does seem certain, however, that if some as yet inchoate future dispute were to arise implicating such issues, the reviewing court might well be asked to consider the Forest Service's representations in this case as part of deciding what actions might or might not be permitted to go forward at a later date. Separately, as to any argument that the Orogrande Project is (or could be) a contributing factor to the further diminishment or abandonment of the West Fork Crooked River IRA through future reprisals of similar decisions, the undersigned is not persuaded on this record. There is no evidence to suggest that this has happened before, or is about to happen again (within the West Fork Crooked River IRA or elsewhere). Regardless, any such future conduct would still be subject to NEPA's requirements. *See* (AR 14238) ("Any future proposals for this area would be subject to NEPA requirements and will require a new NEPA decision.").

[10] Under *Cottrell*, a moving party raising a serious question going to the merits of the claim may still prevail if it can show "a balance of hardships that tips *sharply*" in its favor. *Cottrell*, 632 F.3d at 1135 (emphasis added). Even if Plaintiff could present the necessary "serious questions," the balance of hardships does not tip sharply in its favor. According to the Forest Service, the undisputed purpose of the Orogrande Project is to reduce the risk of wildfires to the Orogrande community. *See* Defs.' Opp. to Mot. for P.I., p. 18 (Docket No. 35) ("[G]iven the conditions and location of the community, should a large fire approach this community, it would be unsafe for fire fighters to remain in and defend the community, and while the community has taken fire protection measures, those measures alone are insufficient to protect the community."). Such public interests are real, the economic and managerial interests voiced by the Forest Service carry significant weight, and the sum of the same are not sharply outweighed by the recreational and scientific interests articulated by Plaintiff. *See, e.g.*, *Native Ecosystems Council v. Weldon*, 2016 WL 4591897, *2-3 (D. Mont. 2016).

**MEMORANDUM DECISION AND ORDER - 19**

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for

Preliminary Injunction (Docket No. 26) is DENIED.

DATED:  **May 31, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge